**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**(MIAMI DIVISION)**

Case No. 1:21-cv-21373-GAYLES

SOCIAL LIFE NETWORK, INC.,

               Plaintiff,

   v.

PEAK ONE OPPORTUNITY FUND, L.P.,
and JASON GOLDSTEIN,

               Defendants.

**DEFENDANTS' MOTION TO DISMISS**
**AND INCORPORATED MEMORANDUM OF LAW**

Aaron Resnick (Fla. Bar No. 141097)
LAW OFFICES OF AARON RESNICK, P.A.
100 Biscayne Blvd.
Miami, FL 33132
(305) 672-7495
aresnick@thefirmmiami.com

Helgi C. Walker*
Brian A. Richman*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500
hwalker@gibsondunn.com
brichman@gibsondunn.com

Barry Goldsmith*
M. Jonathan Seibald*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-2440
bgoldsmith@gibsondunn.com
jseibald@gibsondunn.com

*Attorneys for Defendants*

June 11, 2021
_____
* *pro hac vice.*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

    A.   Social Life Solicits Investors And Offers Standard Anti-Dilution Protections. ............. 2

    B.   Social Life Issues Billions Of Shares At Fractions Of A Penny, Triggering The
         Agreed-Upon Anti-Dilution Protections. ......................................................................... 3

    C.   Social Life Claims It Was Unaware Of The Anti-Dilution Protections And Sues
         Its Own Investors To Rescind The Agreements. .............................................................. 4

ARGUMENT ....................................................................................................................... 5

I.    Social Life's Exchange Act Claims Are Meritless. ........................................................... 5

    A.   Section 29(b) Does Not Void The Transactions. ............................................................. 5

        1.   Social Life's Claim Is Time Barred. ........................................................................ 6

        2.   Peak One Is Not An Unlicensed Securities "Dealer." ............................................. 7

        3.   In Any Case, The Warrant Could Have Been Lawfully Performed. ...................... 9

    B.   Social Life Does Not Plausibly Allege Fraud. ................................................................. 9

II.   Social Life's Contract Claims Fail. ................................................................................. 13

    A.   The Parties Agree That Nevada Law Controls. ............................................................. 13

    B.   Social Life's Claims Are Not Viable Under Nevada Law. ............................................. 13

        1.   The Transactions Are Not Usurious. ...................................................................... 13

        2.   The Transactions Are Not Unconscionable. ......................................................... 16

        3.   A Theory Of Unjust Enrichment Is Not Available. ............................................. 19

III.  Social Life Fails To Plead Conversion. ........................................................................... 19

IV.  Social Life Fails To State A Claim Against Mr. Goldstein. ............................................. 20

CONCLUSION ................................................................................................................... 20

REQUEST FOR HEARING ............................................................................................... 21

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Motta ex rel. A.M. v. United States*,
717 F.3d 840 (11th Cir. 2013) .........................................................................................7, 12

*Adar Bays, LLC v. 5Barz Int'l, Inc.*,
2018 WL 3962831 (S.D.N.Y. Aug. 16, 2018)..........................................................................1

*Adar Bays, LLC v. Aim Exploration, Inc.*,
285 F. Supp. 3d 698 (S.D.N.Y. 2018)....................................................................................1

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
341 F. Supp. 3d 339 (S.D.N.Y. 2018)....................................................................................1

*Alpha Capital Anstalt v. Oxysure Sys., Inc.*,
216 F. Supp. 3d 403 (S.D.N.Y. 2016)....................................................................................6

*Automotive Experts, LLC v. St. Charles Pontiac Inc.*,
2015 WL 846570 (E.D. La. Feb. 25, 2015) .........................................................................15

*Bayuk v. Prisiajniouk*,
2019 WL 4694230 (M.D. Fla. Sept. 26, 2019)....................................................................13

*Bill Stremmel Motors, Inc. v. IDS Leasing Corp.*,
89 Nev. 414 (1973) .............................................................................................................18

*Blue Citi, LLC v. 5Barz Int'l, Inc.*,
338 F. Supp. 3d 326 (S.D.N.Y. 2018)....................................................................................1

*Bryant v. Avado Brands, Inc.*,
187 F.3d 1271 (11th Cir. 1999) ......................................................................................2, 21

*Building Energetix Corp. v. EHE, LP*,
129 Nev. 78 (2013) .............................................................................................................15

*Burger King Corp. v. Austin*,
805 F. Supp. 1007 (S.D. Fla. 1992) ....................................................................................19

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985).............................................................................................................15

*Celsion Corp. v. Stearns Mgmt. Corp.*,
157 F. Supp. 2d 942 (N.D. Ill. 2001) ....................................................................................6

*Chur v. Eighth Jud. Dist. Ct.*,
　136 Nev. 68 (2020) ........................................................................................................4

*Coastal Inv. Partners, LLC v. DSG Glob., Inc.*,
　2018 WL 2744719 (S.D.N.Y. 2018) ..............................................................................1

*Czerniewski v. TD Ameritrade, Inc.*,
　2021 WL 1214782 (D. Nev. Mar. 29, 2021) ................................................................19

*Dimension Leasing, Inc. v. Variety Children's Hosp.*,
　2007 WL 9701159 (S.D. Fla. Mar. 19, 2007) ..............................................................16

*Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*,
　594 F.3d 783 (11th Cir. 2010) ....................................................................................12

*EMA Fin., LLC v. AIM Exploration, Inc.*,
　2019 WL 689237 (S.D.N.Y. Feb. 19, 2019) ..................................................................1

*EMA Fin., LLC v. NFusz, Inc.*,
　2020 WL 7629580 (S.D.N.Y. Dec. 22, 2020) ......................................................1, 5, 10

*EMA Fin., LLC v. NFusz, Inc.*,
　444 F. Supp. 3d 530 (S.D.N.Y. 2020) ..........................................................1, 14, 16, 17

*EMA Fin., LLC v. Pharmagreen Biotech Inc.*,
　No. 1:20-cv-5662 (S.D.N.Y. July 31, 2020) ...............................................................1, 5

*EMA Fin., LLC v. Vystar Corp.*,
　2021 WL 1177801 (S.D.N.Y. Mar. 29, 2021) ................................................................5

*Fox v. First Data Merch. Servs., LLC*,
　2018 WL 2357272 (S.D. Fla. Jan. 30, 2018) ...............................................................13

*Gankaku Living Tr. v. Life on Earth, Inc.*,
　No. 655189/2019 (N.Y. Sup. Ct. Nov. 18, 2020) ..........................................................2

*Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*,
　267 F.3d 1228 (11th Cir. 2001) ..................................................................................14

*Goldenberg v. Bache & Co.*,
　270 F.2d 675 (5th Cir. 1959) ........................................................................................6

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
　189 F.3d 971 (9th Cir. 1999) ........................................................................................2

*Knudsen v. Ethicon, Inc.*,
　2021 WL 390825 (M.D. Fla. Feb. 4, 2021) .................................................................13

iii

*L'Arbalete, Inc. v. Zaczac,*
    474 F. Supp. 2d 1314 (S.D. Fla. 2007) ...................................................................13

*La Grasta v. First Union Sec., Inc.,*
    358 F.3d 840 (11th Cir. 2004) .................................................................................2

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,*
    501 U.S. 350 (1991) ..................................................................................................6

*Law Off. of James G. Dodrill, II, P.A. v. Datameg Corp.,*
    2008 WL 11412078 (S.D. Fla. June 23, 2008) .......................................................16

*Leasepartners Corp. v. Robert L. Brooks Tr.,*
    113 Nev. 747 (1997) ................................................................................................19

*LG Capital Funding, LLC v. 5Barz Int'l, Inc.,*
    307 F. Supp. 3d 84 (E.D.N.Y. 2018) ......................................................................1

*LG Capital Funding, LLC v. Aim Exploration, Inc.,*
    2018 WL 4119149 (S.D.N.Y. Aug. 29, 2018) .........................................................1

*LG Capital Funding, LLC v. Cardinal Energy Grp.,*
    No. 1:17-cv-9181 (S.D.N.Y. Dec. 10, 2018) ...........................................................1

*LG Capital Funding, LLC v. ExeLED Holdings, Inc.,*
    2018 WL 6547160 (S.D.N.Y. Sept. 28, 2018).................................................5, 9, 12

*LG Capital Funding, LLC v. Windstream Techs., Inc.,*
    2018 WL 4119158 (S.D.N.Y. Aug. 29, 2018) .........................................................1

*Lipshie v. Tracy Inv. Co.,*
    93 Nev. 370 (1977) ................................................................................................19

*Malin v. Ivax Corp.,*
    17 F. Supp. 2d 1345 (S.D. Fla. 1998) ...................................................................20

*Martin v. Creative Mgmt. Grp., Inc.,*
    2013 WL 12061809 (S.D. Fla. July 26, 2013)........................................................20

*Mayfield v. Koroghli,*
    124 Nev. 343 (2008) ..............................................................................................10

*Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.,*
    761 So. 2d 306 (Fla. 2000)....................................................................................13

*Merck & Co. v. Reynolds,*
    559 U.S. 633 (2010).................................................................................................6

*Mills v. Elec. Auto-Lite Co.*,
396 U.S. 375 (1970) ..................................................................................6

*Moynet v. Courtois*,
8 So. 3d 377 (Fla. 3d DCA 2009) ...........................................................19

*Navajo Health Found. v. Razaghi Dev. Co.*,
2021 WL 961746 (D. Nev. Mar. 15, 2021) ..............................................20

*New Prime Inc. v. Oliveira*,
139 S. Ct. 532 (2019) ................................................................................7

*NuVasive, Inc. v. Absolute Med., LLC*,
2019 WL 1468522 (M.D. Fla. Feb. 11, 2019) ..........................................20

*Obstfeld v. Thermo Niton Analyzers, LLC*,
108 A.D.3d 658 (N.Y. App. Div. 2013) .....................................................6

*Paredes v. Bank of Am., N.A.*,
2018 WL 1071935 (M.D. Fla. Feb. 27, 2018) ..........................................12

*Peter E. Shapiro, P.A. v. Wells Fargo Bank, N.A.*,
2019 WL 8164772 (S.D. Fla. Oct. 7, 2019) .........................................7, 12

*Power Up Lending Grp. v. Alliance Bioenergy Plus, Inc.*,
2019 WL 1322621 (E.D.N.Y. Feb. 28, 2019) .............................................1

*Power Up Lending Grp. v. Cardinal Energy Grp.*,
2019 WL 1473090 (S.D.N.Y. Apr. 3, 2019) ...............................................1

*Power Up Lending Grp. v. Sunstock, Inc.*,
No. 608111/2018 (N.Y. Sup. Ct. Dec. 4, 2018) .........................................2

*Progressive Water Treatment v. Yellowstone Capital LLC*,
No. 814628/2020 (N.Y. Sup. Ct. Jan. 5, 2021) ..........................................1

*Rando v. Gov't Emps. Ins. Co.*,
556 F.3d 1173 (11th Cir. 2009) ................................................................13

*Rimini St., Inc. v. Oracle Int'l Corp.*,
473 F. Supp. 3d 1158 (D. Nev. 2020) .......................................................14

*Risinger v. SOC LLC*,
936 F. Supp. 2d 1235 (D. Nev. 2013) .......................................................14

*Rodriguez v. JPay, Inc.*,
2019 WL 11624312 (S.D. Fla. Oct. 21, 2019) ..........................................19

*Social Life Network, Inc. v. LGH Invs., LLC*,
No. 3:21-cv-767 (S.D. Cal. filed Apr. 19, 2021) ................................................................4

*Stedor Enters., Ltd. v. Armtex, Inc.*,
947 F.2d 727 (4th Cir. 1991) ...........................................................................................16

*Swenson v. Engelstad*,
626 F.2d 421 (5th Cir. 1980) ...........................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)............................................................................................................9

*Thompson v. RelationServe Media, Inc.*,
610 F.3d 628 (11th Cir. 2010) .........................................................................................20

*Thompson v. Smith Barney, Harris Upham & Co.*,
709 F.2d 1413 (11th Cir. 1983) .......................................................................................11

*U.S. Home Corp. v. Michael Ballesteros Tr.*,
134 Nev. 180 (2018) .........................................................................................................16

*Viridis Corp. v. TCA Glob. Credit Master Fund, LP*,
721 F. App'x 865 (11th Cir. 2018) ..............................................................................13, 14

*Weisbrod v. Lowitz*,
282 Ill. App. 252 (1935) .....................................................................................................8

*Weiss v. Altholtz*,
2011 WL 4538459 (N.D. Ill. Sept. 29, 2011) ..........................................................6, 7, 12

**Statutes**

15 U.S.C.
§ 77b(a)(10) .......................................................................................................................4
§ 78c(a)(4)(A) .....................................................................................................................8
§ 78c(a)(5)(A) ..................................................................................................................7, 8
§ 78cc(b) .............................................................................................................................5
§ 78*l*(a)(2) ..........................................................................................................................4
§ 78u-4(b) ...........................................................................................................................9

Nev. Rev. Stat.
§ 99.050(1).........................................................................................................................14
§ 604A.400.........................................................................................................................15
§ 604A.5042.......................................................................................................................15

**Rules**

Fed. R. Civ. P. 9(b) .................................................................................................................9

**Regulations**

17 C.F.R.
    § 230.144 ........................................................................................................11
    § 230.144(d)(1)(i) .........................................................................................11
    § 230.144(d)(3)(ii) ........................................................................................11

**Other Authorities**

*About Us*, Social Life, https://www.socialnetwork.ai/about-wdlf
    (last visited June 11, 2021) ..........................................................................4

C.H. Meyer, Law of Stock Brokers and Stock Exchanges (1933) ................................8

SEC, Report on the Feasibility and Advisability of the Complete Segregation of
    the Functions of Dealer and Broker (1936) ..................................................8

*WDLF*, Yahoo! Finance, https://tinyurl.com/7vux6wx7 ...........................................2

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Peak One Opportunity Fund, L.P. and Jason Goldstein respectfully move to dismiss Plaintiff Social Life Network, Inc.'s Complaint (Dkt. 1) with prejudice. Dismissal is warranted because the complaint fails to state a claim for which relief can be granted.

## INTRODUCTION

This is a strike suit. Social Life's counsel has pioneered a cottage industry of opportunistic claims for microcap companies. The strategy is simple: the microcap company raises hundreds of thousands of dollars by selling convertible debentures or warrants to its investors. But when the time comes to make good on those securities and deliver the shares the investors are owed, the company balks. It declares that a litany of increasingly implausible, hyper-technical allegations has entitled it to void the agreements while (conveniently) keeping the cash. Some investors simply settle, rather than spend time and money fighting it out in court. Others do not. In those cases that have gone to litigation, Social Life's counsel's theories have been rejected by the last eighteen courts to consider them.[1] This case should be the nineteenth.

---

[1] *See EMA Fin., LLC v. NFusz, Inc.*, 444 F. Supp. 3d 530, 543 (S.D.N.Y. 2020); *EMA Fin., LLC v. NFusz, Inc.*, 2020 WL 7629580, at *14 n.22 (S.D.N.Y. Dec. 22, 2020); Conf. Hr'g Tr. 20:1–9, *EMA Fin., LLC v. Pharmagreen Biotech Inc.*, No. 1:20-cv-5662 (S.D.N.Y. July 31, 2020), ECF No. 17; *Power Up Lending Grp. v. Alliance Bioenergy Plus, Inc.*, 2019 WL 1322621, at *5 (E.D.N.Y. Feb. 28, 2019), *adopted*, 2019 WL 1317456 (E.D.N.Y. Mar. 22, 2019); *EMA Fin., LLC v. AIM Exploration, Inc.*, 2019 WL 689237, at *10 (S.D.N.Y. Feb. 19, 2019); *Power Up Lending Grp. v. Cardinal Energy Grp.*, 2019 WL 1473090, at *6 (S.D.N.Y. Apr. 3, 2019); *Adar Bays, LLC v. 5Barz Int'l, Inc.*, 2018 WL 3962831, at *7 (S.D.N.Y. Aug. 16, 2018); *Adar Bays, LLC v. Aim Exploration, Inc.*, 285 F. Supp. 3d 698, 701–06 (S.D.N.Y. 2018); *Adar Bays, LLC v. GeneSYS ID, Inc.*, 341 F. Supp. 3d 339, 352–54 (S.D.N.Y. 2018); *Blue Citi, LLC v. 5Barz Int'l, Inc.*, 338 F. Supp. 3d 326, 337 (S.D.N.Y. 2018); *Coastal Inv. Partners, LLC v. DSG Glob., Inc.*, 2018 WL 2744719, at *4–7 (S.D.N.Y. 2018); *LG Capital Funding, LLC v. Cardinal Energy Grp.*, No. 1:17-cv-9181, slip op. at 5–10 (S.D.N.Y. Dec. 10, 2018), ECF No. 21; *LG Capital Funding, LLC v. 5Barz Int'l, Inc.*, 307 F. Supp. 3d 84, 98 (E.D.N.Y. 2018); *LG Capital Funding, LLC v. Aim Exploration, Inc.*, 2018 WL 4119149, at *4–6 (S.D.N.Y. Aug. 29, 2018); *LG Capital Funding, LLC v. Windstream Techs., Inc.*, 2018 WL 4119158, at *4–5 (S.D.N.Y. Aug. 29, 2018); *Progressive Water Treatment v. Yellowstone Capital LLC*, No. 814628/2020, slip op. at 4–7 (N.Y. Sup. Ct. *(Cont'd on next page)*

## BACKGROUND

This case is part of a broader effort by Social Life, a sophisticated, publicly traded corporation, to get out of its contractual obligations to its investors.

### A.   Social Life Solicits Investors And Offers Standard Anti-Dilution Protections.

In 2019, Social Life was still "in the early stages of [its] business" and experiencing trouble raising any "financings at all." Social Life, Annual Report 31 (Form 10-K) (Mar. 15, 2019); *see* Compl. ¶ 11.[2] The company turned to a "registered broker-dealer," J.H. Darbie, to find potential investors. *See* Dkt. 1-3 § 3(u), at 11.

Peak One was one of them.  In April 2019, Peak One purchased from Social Life two securities for $375,000:  a convertible debenture and a warrant.  Dkt. 1-3, at 1 (securities purchase agreement).  The debenture was closed out within a few months, *see* Compl. ¶ 75—"nullified," as Social Life put it, Social Life, Quarterly Report, at F-15 (Form 10-Q) (Nov. 14, 2019)—but the warrant remained active.  It granted Peak One the right, but not the obligation, to purchase 300,000 shares of Social Life's common stock at a price of $0.20 per share.  Dkt. 1-2, at 1.[3]

This was an enormously risky investment for Peak One.  At the time, everyone knew that Social Life was bleeding cash.  *See* Social Life, Quarterly Report, at F-3 (Form 10-Q) (May 3, 2019).  And its stock was trading between $0.12 and $0.17 per share[4]—well under the warrant's

---

Jan. 5, 2021); *Gankaku Living Tr. v. Life on Earth, Inc.*, No. 655189/2019, slip op. at 2 (N.Y. Sup. Ct. Nov. 18, 2020); *Power Up Lending Grp. v. Sunstock, Inc.*, No. 608111/2018, slip op. at 5–6 (N.Y. Sup. Ct. Dec. 4, 2018).

[2]  The Court may take "judicial notice of a company's SEC filings." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1279 (11th Cir. 1999); *see also, e.g.*, *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) (noticing that "market was aware" of public information).

[3]  The warrant is held by Peak One Investments, LLC.  *See* Dkt. 1-2, at 1.

[4]  *See WDLF*, Yahoo! Finance, https://tinyurl.com/7vux6wx7.  Stock prices "are a proper subject for judicial notice." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir. 2004).

$0.20 strike price.  Thus, unless things turned around, the warrant would have been worthless when it expired.  Potential dilution only compounded the risk.  Social Life's contemporaneous disclosures warned the market that the company would "need substantial additional funding to continue [its] operations," and that it contemplated the sale of additional securities at any "price" it deemed appropriate.  Social Life, Annual Report 13, 19 (Form 10-K) (Mar. 15, 2019).  These "[f]uture sales," the company explained, "could result in substantial dilution" to shareholders.  *Id.* at 19.

To mitigate this risk, Social Life offered Peak One standard anti-dilution protections.  So standard were these protections that the relevant provision was taken from Social Life's prior warrants posted to the SEC's website.  *See infra* p. 18.  *Compare* Dkt. 1-2 § 2(b), at 4, *with* Social Life, Registration Statement, Ex. 4.2, at 6 (Form S-1) (Jan. 25, 2018) (attached as Appendix A for the Court's convenience).  "If" Social Life sold stock "at an effective price per share less than" $0.20 (Peak One's strike price), Peak One's warrant would reset.  Dkt. 1-2 § 2(b), at 4.  Peak One would get the benefit of the more favorable price Social Life had offered to other investors.  *See id.*  And "the number of Warrant Shares issuable" would be adjusted, such that the aggregate exercise price—the exercise price times the number of shares—would remain constant.  *Id.*

## B.   Social Life Issues Billions Of Shares At Fractions Of A Penny, Triggering The Agreed-Upon Anti-Dilution Protections.

Social Life soon triggered the anti-dilution protections.  It issued *billions* of shares to other investors at up to a 99.95% discount to Peak One's strike price.  *See, e.g.*, Social Life, Quarterly Report, at F-18 (Form 10-Q) (June 29, 2020) (issuing over 150,000,000 shares at a price of $0.0001 per share).  This entitled Peak One to adjust its warrant and submit a series of "exercise notices" for "tens of millions of shares," Compl. ¶ 12—to make up for the billions of shares Social Life was issuing to others at fractions of a penny.  Social Life honored the first "three" notices—and raised no concerns.  *Id.*  But the company continued to issue billions of discounted shares.  *See,*

*e.g.*, Social Life, Quarterly Report, at F-15 (Form 10-Q) (Nov. 16, 2020).  And rather than continue to honor the terms of its agreement with Peak One, Social Life sued to "rescind" it.

### C.   Social Life Claims It Was Unaware Of The Anti-Dilution Protections And Sues Its Own Investors To Rescind The Agreements.

Social Life declared that its CEO, Ken Tapp, *see, e.g.*, Dkt. 1-3, at 26—a man who attended Harvard Business School, spent over a decade working as a venture capitalist,[5] and owes a fiduciary duty to Social Life's shareholders to understand the material terms of the agreements he signs, *see, e.g.*, *Chur v. Eighth Jud. Dist. Ct.*, 136 Nev. 68, 72 (2020)—was unaware of the mechanics of the anti-dilution provision (Compl. ¶ 117) that he personally initialed (*see* Dkt. 1-2, at 4).  This, Social Life said, was not a onetime oversight:  no one at Social Life, the company conveniently alleged in a contemporaneously filed suit against other investors, supposedly had any idea how similar anti-dilution provisions worked in *other* warrants Social Life sold in April 2019.  *See Social Life Network, Inc. v. LGH Invs., LLC*, No. 3:21-cv-767 (S.D. Cal. filed Apr. 19, 2021).

Never mind that Social Life "represent[ed] and warrant[ed]" that the "Company's executive officers and directors have studied and fully understand the nature of the securities being sold." Dkt. 1-3 § 3(*o*), at 6, 10.  Never mind that the "Board of Directors of the Company ha[d] concluded, in its good faith business judgment," that selling the securities was "in the best interests of the Company."  *Id.*  Never mind that the terms of which Social Life claims to have had no understanding were actually taken from Social Life's own publicly disclosed prior agreements.  *Infra* pp. 16, 18.  And never mind that as the seller of a security, Social Life was required, under Section 12(a)(2) of the Securities Act, to ensure the accuracy of every statement, *see* 15 U.S.C. § 78*l*(a)(2), in the warrant, a "written" "communication," *id.* § 77b(a)(10).  Social Life claimed ignorance anyway,

---

[5]   *About Us*, Social Life, https://www.socialnetwork.ai/about-wdlf (last visited June 11, 2021).

and threw out a litany of increasingly meritless claims to try to void, rescind, or otherwise defeat the warrants that every one of its directors had agreed to, *see* Dkt. 1-3 § 3(*o*), at 10.

At the appropriate time, Peak One is prepared to hold Social Life to its end of the bargain and to seek other appropriate relief for Social Life's and Mr. Tapp's fraud and other misconduct.

## ARGUMENT

### I.      Social Life's Exchange Act Claims Are Meritless.

Social Life's counsel has apparently convinced a number of publicly traded microcap companies that they should challenge their obligation to pay back their investors on the grounds that every purchaser of a convertible debenture or warrant is actually a securities "dealer" subject to—but not in compliance with—the same regulatory scheme applicable to J.P. Morgan.  That is nonsense, and every court to rule on this argument has rejected it.[6]

### A.      Section 29(b) Does Not Void The Transactions.

Social Life claims that the warrant is void under Section 29(b) because it was somehow "made in violation of" the Exchange Act.  15 U.S.C. § 78cc(b); *see* Compl. ¶¶ 78–87.  The theory seems to be that anyone who "purchases and sells" a security on more than a "few" occasions is a securities "dealer" and that—since Peak One "purchase[d]" the warrant and, after partially exercising it, "sold" shares—"Peak One was acting as a securities dealer" and should have been registered as such, but, because it was not registered, the warrant is inherently unlawful.  Compl. ¶¶ 8, 25, 29, 39, 80.  This theory is fatally flawed for several reasons:  the statute of limitations expired last year; Peak One is not a dealer; and even if it were, the warrant transaction was still lawful.

---

[6] *See NFusz*, 2020 WL 7629580, at *14 n.22; Conf. Hr'g Tr. 20:1–9, *Pharmagreen*, No. 1:20-cv-5662, ECF No. 17; *see also EMA Fin., LLC v. Vystar Corp.*, 2021 WL 1177801, at *3 (S.D.N.Y. Mar. 29, 2021); *LG Capital Funding, LLC v. ExeLED Holdings, Inc.*, 2018 WL 6547160, at *5 (S.D.N.Y. Sept. 28, 2018).

### 1.    Social Life's Claim Is Time Barred.

Social Life's Section 29(b) bid fails at the outset, because Social Life filed its complaint a year after the statute of limitations had run.  Social Life claims an implied "private right of action" under Section 29(b).  Compl. ¶ 87 (citing *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970)).  But an "implied cause of action under Section 29(b)" is subject to "a one-year statute of limitations," *Alpha Capital Anstalt v. Oxysure Sys., Inc.*, 216 F. Supp. 3d 403, 408 (S.D.N.Y. 2016), which, in this case, expired in April 20*20*—one year after "Peak One entered into [the] transactions," Compl. ¶ 30.  Social Life's April 20*21* complaint is a year too late.

The Supreme Court has made clear that in cases like this one—where "the claim asserted is one implied" under the Exchange Act—the Court must borrow the "1-and-3-year [limitations] structure [from] the Act's original remedial provisions."  *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 359, 361 (1991).  So even though Section 29(b) does not itself provide an "express limitation [period] for the rescission of a transaction for [an alleged] violation of . . . the broker-dealer registration requirements," the usual "one-and-three-year structure" controls.  *Celsion Corp. v. Stearns Mgmt. Corp.*, 157 F. Supp. 2d 942, 947 (N.D. Ill. 2001); *accord Alpha Capital*, 216 F. Supp. 3d at 408; *Weiss v. Altholtz*, 2011 WL 4538459, at *2 (N.D. Ill. Sept. 29, 2011); *Obstfeld v. Thermo Niton Analyzers, LLC*, 108 A.D.3d 658, 659 (N.Y. App. Div. 2013).  As a result, Social Life had to file its complaint within three years of the violation *and* within "one year" of the "discovery" of "facts constituting the violation."  *Lampf*, 501 U.S. at 364.  It did not.

The one-year clock started to run, not when Social Life claims to have "first kn[own]" of the alleged violation, but when, "with due diligence," Social Life "*should* [have] know[n]" of the facts that "form the basis of" the violation.  *Merck & Co. v. Reynolds*, 559 U.S. 633, 646 (2010) (emphasis altered); *see Goldenberg v. Bache & Co.*, 270 F.2d 675, 681 (5th Cir. 1959) (holding that "discovery" within "the meaning of [Section 29(b)] . . . means either actual knowledge or

notice of facts which, in the exercise of due diligence, would have led to actual knowledge of the violation"). That time was April 11, 2019—the day "Peak One entered into [the] transactions." Compl. ¶ 30. At that time, Social Life could "easily" have "discover[ed]" that Peak One was not "register[ed] with the SEC" as a dealer by "looking at the Financial Industry Regulatory Authority's (FINRA) website," which lists every registered dealer. *Weiss*, 2011 WL 4538459, at \*2; *see also Motta ex rel. A.M. v. United States*, 717 F.3d 840, 847 (11th Cir. 2013) (finding that an issue "could have been avoided with due diligence" where, as here, the relevant facts would have been readily apparent by "searching a website"). That Social Life did not conduct that "simple . . . search" for nearly two years is fatal to its case, *Peter E. Shapiro, P.A. v. Wells Fargo Bank, N.A.*, 2019 WL 8164772, at \*2 (S.D. Fla. Oct. 7, 2019); by now, Social Life is out of time.

### 2. Peak One Is Not An Unlicensed Securities "Dealer."

Peak One is also not a dealer. Social Life's entire argument is premised on a hyperliteral reading of just nine words in the Exchange Act—"buying and selling securities . . . for such person's own account." 15 U.S.C. § 78c(a)(5)(A). Stripping that phrase of its historical and statutory context, Social Life insists that literally any business that "purchases and sells" securities on more than a "few" occasions is a dealer. Compl. ¶¶ 8, 39. That is absurd, and is not the law. Social Life's reading would mean that virtually ***every hedge fund, investment company, and family office—firms that buy and sell billions of dollars of securities each year—has been operating unlawfully since the Exchange Act's adoption*** because it failed to register as a dealer.

Absurdity aside, the problem with Social Life's theory is that it fails to consider the foundational question of statutory interpretation: how would a reasonable person have interpreted the Exchange Act's text "at the time of the Act's adoption"? *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019). On that question, there can be no serious doubt. In 1934, there were two types of businesses that effectuated customer orders: brokers and dealers. A broker bought and

sold securities "*for*" his customer, whereas a dealer bought and sold securities "*from*" and "*to*" his customer.  C.H. Meyer, Law of Stock Brokers and Stock Exchanges § 43-a, at 32–34 (1933) ("Law of Stock Brokers 1933") (emphases added) (Appendix B).  As a matter of ordinary parlance, this distinction between "brokers" and "dealers" was expressed in terms of whose "account" facilitated the customer's trade.  A broker, who acts "as the customer's representative," *id.* at 32, would simply trade "for the account of the customer," SEC, Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker, at XIV (1936) (Appendix C).  As the standard trade confirmation of the day put it, "We have this day bought (or sold) *for your account* and risk."  *E.g.*, *Weisbrod v. Lowitz*, 282 Ill. App. 252, 255 (1935) (emphasis added).  A dealer, in contrast, would execute the customer's trade by taking the opposite side in "his own account."  *Id.*  When a customer wanted to sell, for example, a dealer would effectuate the sale by "buy[ing] from [the] customer . . . for his own account."  Law of Stock Brokers 1933, at 34.  The phrase "own account" referred to the method by which a dealer effectuated his customers' orders; it "distinguished" the "*dealer['s]*" way of doing business "from [that of] a *broker*."  *Id.* at 32.

Adopting this established understanding of the "other's account" versus "own account" distinction between brokers and dealers, Congress, in the Exchange Act, plainly defined those businesses in functional terms of *how* they effectuate customer trades.  Thus, a "broker" is a person "engaged in the business of effecting transactions in securities for the account of others," 15 U.S.C. § 78c(a)(4)(A), while a "dealer" is a person "engaged in the business of buying and selling securities . . . for such person's own account," *id.* § 78c(a)(5)(A).  In 1934, everyone understood this language as distinguishing the two ways of effectuating customer orders.  That is why, for example, a leading treatise in 1933 stated that a dealer "engages in the business of buying and selling securities for his own account," immediately adding:  "He sells to his customers . . . securities

8

which he has purchased for his own account elsewhere, or buys from his customers securities for his own account with a view of disposing of them elsewhere." Law of Stock Brokers 1933, at 32–33. Customer-order facilitation is the key.

And that is exactly why Peak One—along with nearly every hedge fund, investment company, and family office—is not a dealer: they don't serve customers. Social Life does not allege—nor could it allege—that Peak One has ever bought or sold a security for the purpose of facilitating a customer order. For that reason alone, Peak One is not—and has never been—a dealer.

### 3.    In Any Case, The Warrant Could Have Been Lawfully Performed.

Even if Peak One *were* a dealer, Section 29(b) still does not void the warrant. That is because, as every court to rule on this issue has held, the warrant could "have been legally performed." *ExeLED*, 2018 WL 6547160, at *5. Even under Social Life's absurdly broad theory, a firm only "act[s] as a securities dealer . . . by purchasing *and selling* securities." Compl. ¶ 80 (emphasis added). But "nothing" in the warrant "require[s]" Peak One to sell anything, *ExeLED*, 2018 WL 6547160, at *5; it could have just held any shares it received. Accordingly, the warrant does not inherently violate the Act and Section 29(b) does not apply. *Supra* n.6 (collecting cases).

### B.    Social Life Does Not Plausibly Allege Fraud.

Social Life cannot resurrect its Section-29(b), "everyone's-really-a-dealer" theory as a fraud claim under Section 10(b). It is not enough to simply state that Peak One "misrepresented [that] it would *not* act as a dealer," Compl. ¶ 91 (emphasis added), or, conversely, that Peak One *was* "licensed as a . . . dealer," *id.* at 1; *see also id.* ¶¶ 52, 68. Aside from keeping its story straight, Social Life "must state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), and satisfy the "[e]xacting pleading requirements" of the Private Securities Litigation Reform Act, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *see* 15 U.S.C. § 78u-4(b)(1), (2). It does not come close. For all its complaining about "dealer" status—a term that

appears 46 times in the complaint—Social Life does not identify a single instance in which anyone, ever, even mentioned the word "dealer" to Social Life, let alone promised to be or not be one.

The only two "representations" that Social Life even alleges have nothing to do with being a dealer and are unequivocally true. The first—that there "shall not be in effect any law, rule or regulation prohibiting or restricting the transactions," Compl. ¶ 43 (quoting Dkt. 1-3 § 8(m), at 22)—is not even a representation. It is a condition precedent offered to *Peak One*: the full quote actually says that the "Buyer's [*i.e.*, Peak One's] obligation to purchase the Debentures . . . is conditioned upon" there being no law "in effect" that would prohibit the transactions. Dkt. 1-3 § 8(m), at 21–22. Peak One could simply "waive [the] condition," *Mayfield v. Koroghli*, 124 Nev. 343, 352 (2008); it is not a representation to anyone. And even if it were, it is plainly true. As multiple courts have informed Social Life's counsel, anyone—including Judge Buchwald "herself"—can buy a convertible debenture or a warrant without registering as a dealer. *NFusz*, 2020 WL 7629580, at *14 n.22. There are literally thousands of similar transactions, executed by non-dealers, publicly disclosed in the SEC's EDGAR database of corporate filings.

The second alleged misrepresentation—that Peak One "is purchasing the Debentures, and will be acquiring the Conversion Shares, for its own account for investment only and not with a view towards the public sale or distribution thereof," Compl. ¶ 45 (quoting Dkt. 1-3 § 2(a), at 5)— is even more of a stretch. The "Debentures" and "Conversion Shares" refer to the convertible debenture "due [in] three years," Dkt. 1-3, at 1, and the shares "issuable upon conversion" of the debenture, *id.* § 1(a)(ix), at 2. But no one "public[ly] s[old] or distribut[ed]" either. Compl. ¶ 45. The debenture was closed out within months, *see id.* ¶ 75, which is why there is no allegation that Peak One received, much less distributed, "Conversion Shares." Rather, Social Life alleges that Peak One "submitted three exercise notices," *id.* ¶ 12—necessarily under the *warrant*, *see* Dkt. 1-

2, Ex. A ("Exercise Notice")—and "acquired" stock "[p]ursuant to . . . the *Warrant*," Compl. ¶¶ 17, 20 (emphasis added).  Yet none of that could even conceivably be contrary to the alleged representation concerning the "Debentures," an entirely different security.  *Id.* ¶ 45.

Even if Peak One *had* acquired and sold "Conversion Shares" under the "Debentures"— and it did not—the alleged representation is nevertheless true:  as a matter of law, Peak One was not acting "with a view towards [a] public sale or distribution."  Compl. ¶ 45.  Contrary to Social Life's feigned ignorance, the phrase "a view towards [a] public sale or distribution" has nothing to do with being a dealer; it is a term of art under SEC Rule 144, which concerns underwriters.  So long as an investor holds a restricted security, like the securities here, *see, e.g.*, Dkt. 1-1, at 1 ("The securities are restricted"), for six months, *see* 17 C.F.R. § 230.144(d)(1)(i), the investor may resell the securities (or securities converted from those securities, *see id.* § 230.144(d)(3)(ii)), without being considered to have "t[aken] the securities 'with a view to distribution,'" *id.* § 230.144 prelim. note.  That is exactly what the parties contemplated here:  they "acknowledge[d] and agree[d] that . . . [subsequent sales would be made] in accordance with the terms of Rule 144" and that Social Life would instruct its transfer agent to transfer shares to Peak One "at such time as [Peak One] ha[d] held the Securities for the minimum holding period permitted under Rule 144."  Dkt. 1-3 § 4(a), at 11–12; *cf.* Compl. ¶ 13 (alleging that Peak One's "business model" was to "hold[ ]" the securities for "six months").  By Rule-144 definition, that is not acting with a view to distribution.

In any event, Social Life's fraud claims lack two essential elements—apart from falsity. *First*, Social Life cannot demonstrate that it "exercise[d] 'due diligence' in" selling the securities to Peak One.  *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980); *accord Thompson v. Smith Barney, Harris Upham & Co.*, 709 F.2d 1413, 1418 (11th Cir. 1983) ("'due diligence' [is] a sep- arate element in 10b-5 cases").  If Social Life really cared, it "could have easily used the FINRA

11

search website to quickly learn whether [Peak One] was a registered broker-dealer." *Weiss*, 2011 WL 4538459, at *5.  "Failing to verify [that fact] with publicly available information does not qualify as due diligence," *Paredes v. Bank of Am., N.A.*, 2018 WL 1071935, at *3 (M.D. Fla. Feb. 27, 2018), and dooms Social Life's claims.  *See also Motta*, 717 F.3d at 847 (failing to "search[ ] a website" does not qualify as "due diligence"); *Shapiro*, 2019 WL 8164772, at *2 (where information was "publicly available," plaintiff "cannot demonstrate that he acted with due diligence").

*Second*, Social Life cannot reasonably have "relied," *Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 594 F.3d 783, 789 (11th Cir. 2010), on any implication that Peak One would not (in Social Life's words) "engage in dealer activity," Compl. ¶ 54, by which Social Life means, "[s]ell[ ]" the exercised shares, *id.* ¶ 29.  Social Life claims that it was "unaware" that Peak One would do so, "thereby [potentially] causing a decrease in [Social Life's] market capitalization" and "share price."  *Id.* ¶ 54.  But that alleged naivety is "belied by both the Contracts and simple logic."  *ExeLED*, 2018 WL 6547160, at *8.  "[W]ithout the right to sell its stock in [Social Life], [Peak One's] [exercise] right"—and the warrant itself—"would be essentially worthless."  *Id.*  And it is "a matter of fundamental economics that an increase in the supply of shares on the market would likely depress the price of [Social Life's] shares."  *Id.*  Far from being "unaware" of this possibility, Compl. ¶ 54, Social Life explicitly "represent[ed] and warrant[ed] to [Peak One] that . . . [Social Life]'s executive officers and directors . . . recognize that [the securities] have a potential dilutive effect and . . . [that conversion] may have an adverse effect on the Market Price of the Common Stock."  Dkt. 1-3 § 3(*o*), at 6, 10.  This is so obvious that, days after selling the securities at issue here, Social Life disclosed to all of its shareholders that "exercise of warrants outstanding or rights to purchase capital stock could result in additional dilution . . . and could cause [Social Life's] stock price to decline."  Social Life, Quarterly Report 10 (Form 10-Q) (May 3, 2019).

12

There is no reasonable basis for Social Life to assert that it was *unaware* of these market dynamics.

## II.      Social Life's Contract Claims Fail.

### A.      The Parties Agree That Nevada Law Controls.

Social Life acknowledges that its state-law contract claims—counts 4, 5, and 6—are governed "[u]nder Nevada law," Compl. ¶¶ 102, 112, 124, and Peak One agrees. For that reason alone, the Court need not, and should "not[,] address [Social Life's] alternative arguments made under Florida law." *Knudsen v. Ethicon, Inc.*, 2021 WL 390825, at *1 (M.D. Fla. Feb. 4, 2021); *see* Compl. ¶¶ 108, 120 (stating Florida-law claims in the "alternative").

Regardless, the parties' agreement is plainly correct: Nevada law controls. A federal court sitting in diversity, *see* Compl. ¶ 2, must apply the choice-of-law rules of the forum state—here, Florida. *Rando v. Gov't Emps. Ins. Co.*, 556 F.3d 1173, 1176 (11th Cir. 2009). And under Florida law, the "Governing Law" clause in the parties' contract—providing that the transaction is "governed by the internal laws of the State of Nevada," Dkt. 1-3 § 9(b), at 22—is "presumptively valid" and should be "enforce[d]," *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000). Social Life has not attempted to show otherwise. *See id.* (it is the challenger's burden). Thus, the Court must look to Nevada law in addressing: (1) the usury claims in count 4, *see, e.g.*, *Viridis Corp. v. TCA Glob. Credit Master Fund, LP*, 721 F. App'x 865, 874 (11th Cir. 2018); *L'Arbalete, Inc. v. Zaczac*, 474 F. Supp. 2d 1314, 1323 (S.D. Fla. 2007); (2) the unconscionability claims in count 5, *see, e.g.*, *Fox v. First Data Merch. Servs., LLC*, 2018 WL 2357272, at *9 (S.D. Fla. Jan. 30, 2018); and (3) the unjust-enrichment claims in count 6, *see, e.g.*, *Bayuk v. Prisiajniouk*, 2019 WL 4694230, at *4 (M.D. Fla. Sept. 26, 2019).

### B.      Social Life's Claims Are Not Viable Under Nevada Law.

#### 1.      The Transactions Are Not Usurious.

Social Life's usury claim is meritless. It alleges that the "Debenture imposes an interest

rate in excess of the lawfully permitted rate[ ] in . . . Nevada," Compl. ¶ 75, but, as another court recently reminded Social Life's counsel, "Nevada law . . . does not permit corporations to raise a criminal usury defense." *NFusz*, 444 F. Supp. 3d at 540; *accord Viridis*, 721 F. App'x at 873.  In fact, Nevada law explicitly provides that no interest-rate limitation applies:  "parties may agree for the payment of any rate of interest on money due . . . on any contract." Nev. Rev. Stat. § 99.050(1).

Social Life cannot evade this obvious and fatal flaw in its case by claiming that the transactions are nevertheless void on the theory that Peak One was actually subject to a seemingly random Nevada licensing law about "check-cashing" and other related consumer services.  Compl. ¶ 103.  To begin, Peak One is not subject to licensure *in Nevada*.  Peak One is a *Delaware* limited partnership with its principal place of business in *Florida*, *see* Compl. ¶ 7, and it contracted with a corporation based in *Colorado*, *see id.* ¶ 5.  That the Colorado-based entity, Social Life, happens to be incorporated in Nevada and chose to govern its contracts under its domicile's laws does not somehow subject every one of Social Life's counterparties to Nevada licensing schemes.  To the contrary, Nevada regulations are presumed to apply *in Nevada*.  *Risinger v. SOC LLC*, 936 F. Supp. 2d 1235, 1250 (D. Nev. 2013).  And Social Life does not allege—nor could it responsibly allege— that Peak One did anything "within Nevada's borders."  *Rimini St., Inc. v. Oracle Int'l Corp.*, 473 F. Supp. 3d 1158, 1226 (D. Nev. 2020).  The Nevada licensing law simply does not apply.

Nor could it.  As a matter of blackletter constitutional law, Nevada could not subject an out-of-state investor, conducting an out-of-state investment, with an out-of-state-based issuer, to Nevada licensing requirements.  That is because the Due Process Clause constrains a state's ability to regulate "transactions beyond the state's boundaries."  *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1236–37 (11th Cir. 2001).  And the Supreme Court has squarely held that the mere entry into a contract with a domiciliary of a state cannot establish the minimum

14

contacts necessary to subject one to the jurisdiction of that state. *See Burger King Corp. v. Rudze-wicz*, 471 U.S. 462, 478 (1985) ("an individual's contract with an out-of-state party *alone* [cannot] automatically establish sufficient minimum contacts in the other party's home forum"); *see also Automotive Experts, LLC v. St. Charles Pontiac Inc.*, 2015 WL 846570, at *5 (E.D. La. Feb. 25, 2015) (that "one of the parties was domiciled in the forum and that the contract applied the forum State's laws [is] insufficient to establish the [requisite] minimum contacts").

At any rate, the licensing statute that Social Life cites, Nev. Rev. Stat. § 604A.400, does not apply to the types of transactions at issue here. Compl. ¶¶ 103–07. *First*, Social Life alleges that the relevant transactions are "securities transactions," *id.* ¶¶ 12, 16, 62, 67, yet neither Chapter 604A of the Nevada Statutes nor the Nevada Commissioner of Financial Institutions, *id.* ¶ 107, govern securities transactions. Those are left to Chapter 90 and the Nevada Securities Division. *Second*, Chapter 604A applies only to consumer loans, not the business-to-business investments at issue here. "[W]ords are known by . . . the company they keep." *Building Energetix Corp. v. EHE, LP*, 129 Nev. 78, 85 (2013). So while Social Life latches onto a single phrase, "high-interest loan service" (Compl. ¶ 103), read in isolation, that phrase is tethered to—and narrowed by—the other terms in the statutory list: "a check-cashing service, deferred deposit loan service, . . . or title loan service." Nev. Rev. Stat. § 604A.400(1). These services all involve loans to natural persons, not publicly traded corporations. What this language suggests, the broader regulatory scheme confirms. The requirements a "licensee who operates a high-interest loan service" face are entirely premised on the existence of natural-person consumers. You cannot, for example, check the "employment status" of a corporation, *id.* § 604A.5038(2)(b); nor can you (at least, in any context that would make sense) tell it about the benefits of enrolling in "Medicaid," *id.* § 604A.5042. These

are issues that concern only natural persons, the sole focus of Chapter 604A.[7]

### 2.      The Transactions Are Not Unconscionable.

Social Life's unconscionability claim fares no better.  "Nevada law requires both proce-dural and substantive unconscionability to invalidate a contract as unconscionable."  *U.S. Home Corp. v. Michael Ballesteros Tr.*, 134 Nev. 180, 190 (2018).  But the challenged agreement, the warrant, *see* Compl. ¶¶ 114–18, suffers neither defect.[8]

### a)      The Material Terms Are Readily Apparent.

*First*, the warrant is not procedurally unconscionable.  Social Life's claim that it was "un-aware of the function of the cashless exercise provision" because it was "buried in the Warrant" in an "incomprehensible" fashion is not plausible.  Compl. ¶¶ 114–15.  That formula is (as Social Life's counsel is aware) the "industry standard for 'cashless exercise.'"  *NFusz*, 444 F. Supp. 3d at 549.  Searching the SEC's EDGAR database for corporate filings with the *exact* description of one of the variables here ("number of Warrant Shares that the Holder elects to purchase") returns over 300 hits, *see* https://tinyurl.com/4ucdxaf5.  There is nothing unconscionable about placing an industry-standard provision in a contract.  *See, e.g.*, *Stedor Enters., Ltd. v. Armtex, Inc.*, 947 F.2d 727, 733 (4th Cir. 1991).  That is especially true here, where the cashless exercise formula was taken from the cashless exercise formula in Social Life's own prior agreements posted to the SEC's website.  Appendix A, Ex. 4.2, at 2.  It defies belief that Social Life was "unaware" of the "func-tion" of its *own* cashless exercise formula.  Social Life obviously knows how this works.

---

[7]  Social Life loses under Florida law too.  Social Life alleges that the "Debenture imposes" a usurious interest rate "because of the default benefits," Compl. ¶ 75, but payments that are "con-tingent on the happening of an uncertain event (e.g., a default)" are "not usurious," *Law Off. of James G. Dodrill, II, P.A. v. Datameg Corp.*, 2008 WL 11412078, at *9 (S.D. Fla. June 23, 2008).

[8]  Because Florida law also requires "both procedural and substantive unconscionability," *Di-mension Leasing, Inc. v. Variety Children's Hosp.*, 2007 WL 9701159, at *5 (S.D. Fla. Mar. 19, 2007), Social Life's unconscionability claims fail under Florida law as well.

Social Life cannot seriously maintain that the cashless exercise provision was "buried." Compl. ¶ 114. As Social Life tells it, the company was "unaware of the function of the cashless exercise provision considering a strike price of $0.20 was on the face of the Warrant." *Id.* ¶ 115. But the *only* sentence disclosing that strike price *also* states in the clearest possible terms that the "'Exercise Price' shall mean $0.20, ***subject to adjustment as provided herein (including but not limited to cashless exercise)*.**"   Dkt. 1-2, at 1 (emphasis added).   Social Life does not explain how or why its senior officers and directors—all of whom approved this agreement, Dkt. 1-3 § 3(*o*), at 10—would have stopped reading at the comma.   Nor does Social Life have any response to the fact that the cashless exercise formula is (1) prominently centered in the middle of a page (2) initialed by Social Life's CEO, Dkt. 1-2, at 2.   In no world is this buried.



Dkt. 1-2, at 2

In any event, it is not clear what harm Social Life is claiming; cashless exercise is just an alternative method of "*pay[ing]* the aggregate exercise price." *NFusz*, 444 F. Supp. 3d at 548 (emphasis added).   The economics of cash and cashless exercise are the same.   Suppose an investor owns a warrant that gives it the right to buy 10 shares of a company's stock at a price of $0.20 per share.   Under a "cash" exercise, the investor will simply hand the company $2.00 for the 10 shares. But now further suppose that the warrant is "in the money"—meaning that the market price of the shares exceeds the strike price.   If the market price is, say, $0.50 per share, the investor can just "deduct[ ]" from its exercise request—*i.e.*, "effectively sell[ ] back"—the four shares (valued at $2.00) needed to "make up the [aggregate] strike price." *Id.* Either way, the investor "transmits payment"—in cash or stock—valued at "the same amount." *Id.* at 549.   Social Life cannot void a

contract by feigning ignorance of a supposedly "buried" provision that has had no impact on it.

Social Life is similarly off base arguing that the warrant's anti-dilution protections are somehow procedurally unconscionable because they supposedly operated in a "deceitful manner." Compl. ¶ 117. Again, the anti-dilution language is industry standard. It simply states that "[i]f" Social Life grants a right to purchase its stock "at an effective price per share less than" that provided in the warrants held by Peak One, Peak One's warrants reset to the more favorable terms. Dkt. 1-2, at 4. Identical language appears in hundreds of agreements disclosed on the SEC's website. *See, e.g.*, https://tinyurl.com/uu98rezu (searching for "number of warrant shares issuable hereunder shall be increased such that the Aggregate Exercise Price payable"). Also and again, the exact language at issue here was taken almost verbatim from Social Life's own prior agreements posted to the

> If the Company * * * shall sell or grant any option to purchase, or sell or grant any right to reprice, or otherwise dispose of or issue * * * any Common Stock or securities entitling any person or entity to acquire shares of Common Stock Equivalents* * * at an effective price per share less than the then Exercise Price then in effect (such lower price, the "Base Share Price" and such issuances collectively, a "Dilutive Issuance") * * * then the Exercise Price shall be reduced at the option of the Holder and only reduced to equal the Base Share Price, and the number of Warrant Shares issuable hereunder shall be increased such that the aggregate Exercise Price payable hereunder, after taking into account the decrease in the Exercise Price, shall be equal to the aggregate Exercise Price prior to such adjustment
>
> **Comparing Dkt. 1-2, at 4, *with* Appendix A, Ex. 4.2, at 6**

SEC's website. Social Life cannot plausibly claim to have deceived itself.

### b)   The Warrant Is Not Substantively Unconscionable.

*Second*, the warrant is not substantively unconscionable. This is a standard warrant; it provided Peak One the right, but not the obligation, to purchase 300,000 shares of common stock at $0.20 per share. Dkt. 1-2, at 1. When Peak One executed the contract, Social Life's stock was trading between $0.12 and $0.17 per share, *supra* p. 2—meaning the warrant, with a $0.20 strike price, had limited value. If Peak One exercised the warrant at that point, it would have lost money.

That the transaction later turned in Peak One's favor does not make the transaction unconscionable. Unconscionability is assessed at "the time of the execution of the contract." *Bill Stremmel Motors, Inc. v. IDS Leasing Corp.*, 89 Nev. 414, 418 (1973). And there is nothing unconscionable about purchasing a warrant conveying a right to buy stock at a price that is *higher* than

the current market price.  Nor can Social Life complain that the warrant ultimately entitled Peak

One to "tens of millions of shares."  Compl. ¶ 117.  That is only because Social Life issued *billions*

of shares at a 99.95% discount to the strike price in Peak One's warrant, triggering the standard

anti-dilution language that Social Life had used in prior warrants.  *Supra* pp. 3–4.

### 3.    A Theory Of Unjust Enrichment Is Not Available.

Social Life's unjust enrichment claim is meritless.  There is no dispute that an express

written agreement exists between the parties.  *See, e.g.*, Compl. ¶ 53 ("The Plaintiff . . . is in con-

tractual privity with Peak One due to the Transaction Documents.").  That alone is fatal to Social

Life's claim, because an "action based on a theory of unjust enrichment is not available when there

is an express, written contract."  *Leasepartners Corp. v. Robert L. Brooks Tr.*, 113 Nev. 747, 755

(1997); *accord Lipshie v. Tracy Inv. Co.*, 93 Nev. 370, 379 (1977).[9]

## III.    Social Life Fails To Plead Conversion.

Social Life's sole tort claim—for conversion—fails as well.  Once again, the parties agree

that Nevada law controls, so the Court need not address Social Life's "alternative" theory under

Florida law.  Compl. ¶ 132.  In any event, "the law of conversion is similar in both states," so the

Court "does not at this time [need to] determine which" law controls.  *Burger King Corp. v. Austin*,

805 F. Supp. 1007, 1012 (S.D. Fla. 1992).  Social Life's claim fails under either.

*First*, neither state would countenance Social Life's attempt to "circumvent a contractual

relationship by bringing a tort claim for conversion."  *Rodriguez v. JPay, Inc.*, 2019 WL 11624312,

at *6 (S.D. Fla. Oct. 21, 2019); *accord Czerniewski v. TD Ameritrade, Inc.*, 2021 WL 1214782, at

*7 (D. Nev. Mar. 29, 2021) ("conversion claim will not lie to enforce contractual obligations").

---

[9]  Social Life's unjust-enrichment claim fails under Florida law for the same reason.  *See, e.g.*,
*Moynet v. Courtois*, 8 So. 3d 377, 379 (Fla. 3d DCA 2009).

*Second*, and in either state, Social Life would need to show that it had a "right to immediate possession" of the property "at the time of the alleged conversion." *Navajo Health Found. v. Razaghi Dev. Co.*, 2021 WL 961746, at *13 (D. Nev. Mar. 15, 2021); *accord, e.g.*, *Martin v. Creative Mgmt. Grp., Inc.*, 2013 WL 12061809, at *9 (S.D. Fla. July 26, 2013) (plaintiff "must establish" an "immediate right to possession of the converted property"). Social Life cannot make that showing. Exhibit B to the Securities Purchase Agreement (Dkt. 1-3, at 31)—which Social Life omitted from the copy of the transaction documents it filed in this Court—is properly subject to judicial notice, *see, e.g.*, *Malin v. Ivax Corp.*, 17 F. Supp. 2d 1345, 1351 (S.D. Fla. 1998), *aff'd*, 226 F.3d 647 (11th Cir. 2000), and "irrevocably . . . instructed [Social Life's transfer agent] to reserve [millions of] shares of Common Stock" for delivery to Peak One upon exercise of the warrant. Appendix D, at 1. Social Life had no right to possess those shares, and thus, cannot state a claim for conversion.

## IV.     Social Life Fails To State A Claim Against Mr. Goldstein.

Lastly, and in addition to the reasons discussed above, the Court should dismiss the claims against Mr. Goldstein. Counts 1, 2, 4, 5, 6, and 7 concern a dispute between two legal entities— Social Life and Peak One. Social Life does not attempt to plead facts necessary to pierce Peak One Investments, LLC's (Peak One's general partner's) version of the corporate veil and get at its managing member, Mr. Goldstein. *See* Dkt. 1-3, at 26 (describing corporate structure); *NuVasive, Inc. v. Absolute Med., LLC*, 2019 WL 1468522, at *4 (M.D. Fla. Feb. 11, 2019). Count 3 of the complaint fares no better. Because the complaint "failed to allege primary" violations of the Exchange Act, *see supra* pp. 5–13, there is "no secondary liability under § 20(a)." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 636 (11th Cir. 2010).

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed.

**REQUEST FOR HEARING**

Defendants respectfully request that the Court hold a hearing on this motion.  Social Life has thrown out a litany of far-fetched, misleading, and, at times, contradictory arguments in an attempt to rescind or otherwise void the various securities it sold to Peak One.  Although Social Life's arguments are meritless, Defendants believe that a hearing would substantially assist the Court in sifting through Social Life's arguments and permit Defendants to efficiently address any questions the Court may have relating to the motion.  That approach will help bring this case to a prompt end, consistent with the "overall aim of the [Private Securities Litigation] Reform Act," which is "structuring litigation to permit the dismissal of frivolous cases at the earliest feasible stage of the litigation."  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).  In addition, this motion is Defendants' first opportunity to be heard by the Court on the substantive issues this case presents.  Defendants therefore respectfully request 60 minutes of oral argument on this motion.

Dated:  June 11, 2021                                    Respectfully submitted,

　　　　*/s Aaron Resnick*                                    *s/ Helgi C. Walker*

Aaron Resnick (Fla. Bar No. 141097)                    Helgi C. Walker*
LAW OFFICES OF AARON RESNICK, P.A.                    Brian A. Richman*
100 Biscayne Blvd., Suite 1607                          GIBSON, DUNN & CRUTCHER LLP
Miami, FL 33132                                         1050 Connecticut Avenue, N.W.
(305) 672-7495                                          Washington, DC 20036-5306
aresnick@thefirmmiami.com                              (202) 955-8500
efile@thefirmmiami.com                                 hwalker@gibsondunn.com
                                                       brichman@gibsondunn.com

                                                       Barry Goldsmith*
                                                       M. Jonathan Seibald*
                                                       GIBSON, DUNN & CRUTCHER LLP
                                                       200 Park Avenue
                                                       New York, NY 10166-0193
                                                       (212) 351-2440
                                                       bgoldsmith@gibsondunn.com
                                                       jseibald@gibsondunn.com


                              *Attorneys for Defendants*

_____

* *pro hac vice.*

22

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of June, 2021, I electronically filed a copy of the foregoing document through the Court's CM/ECF System, which will send notifications of the filing to all counsel of record.

<div style="margin-left: 50%;">

*s/ Aaron Resnick*
Aaron Resnick (Fla. Bar No. 141097)
LAW OFFICES OF AARON RESNICK, P.A.
100 Biscayne Blvd., Suite 1607
Miami, FL 33132
(305) 672-7495
aresnick@thefirmmiami.com
efile@thefirmmiami.com

</div>