**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 1:21-cv-21373-DPG

SOCIAL LIFE NETWORK, INC.,
a Nevada Corporation,

        Plaintiff,

        v.

PEAK ONE OPPORTUNITY FUND, L.P.,
a Delaware Limited Partnership,
JASON C. GOLDSTEIN, an individual,
PEAK ONE INVESTMENTS, LLC, a Delaware
Limited Liability Company, and
J.H. DARBIE & CO., a New York Corporation,

        Defendants.

_____/

## SECOND AMENDED COMPLAINT

       Plaintiff Social Life Network, Inc. ("Social Life", "SLN," or "Plaintiff"), through counsel, respectfully files this Second Amended Complaint against Defendants Peak One Opportunity Fund, L.P. ("PO Fund" or "Peak One Fund"), Peak One Investments, LLC ("PO Investments" or "Peak One Investments"), Jason C. Goldstein ("Goldstein"), (collectively "Peak One Defendants" or "Peak One"), and J.H. Darbie & Co, Inc. ("Darbie") (collectively, all defendants are referred to as "Defendants") and alleges as follows.

## I.    INTRODUCTION[1]

1.      Peak One is a toxic or "death spiral" lender:[2] an unregistered securities dealer whose business model is selling convertible debt products to small, publicly-traded companies that are often struggling to raise capital.[3] These lenders are not the saviors of microcaps that they purport to be, nor is their business model legal.  Rather, as reflected in recent Securities and Exchange Commission ("SEC") prosecutions,[4] these lenders avoid registering so they can evade regulatory oversight.  This, in turn, allows them to make predatory loans that generate outrageous profits.  The business model is simple:  the lender uses the loan transaction to acquire the company's stock at a steep discount[5] (required by the lender in addition to the formal loan interest), which it promptly dumps into the public markets, invariably causing a downward plunge of the stock price.  The Agreements in this case[6] are a masterful example of toxic lending; the substantial harm SLN has suffered is typical of the damage being wreaked by this unlawful industry.

---

[1] This discussion does not reflect all facts alleged nor all bases for relief sought herein.

[2] *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/convertible-securities (accessed 6/27/2021 at 3:56 p.m.); https://en.wikipedia.org/wiki/Death_spiral_financing (accessed 6/28/2021 at 1:23 a.m.).

[3] Based on a review of filings in the EDGAR database, Peak One has purchased convertible securities nearly identical to those in this case from at least 37 penny stock issuers in the last seven years alone; such unlawful toxic lending appears to be its sole source of revenue.  **Exhibit 1.**  In addition to the transactions with issuers between PO Fund and other microcap issuers, **Exhibit 1** also shows references to stock issued to PO Investments pursuant to the transactions to which PO Fund was a party.

[4] *See, e.g., SEC v. Ibrahim Almagarby & Microcap Equity Grp.*, 2020 WL 4783405 (S.D. Fla. Nov. 17, 2017); *SEC v. Keener*, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020); *SEC v. Fierro*, 2020 WL 7481773 (D.N.J. Dec. 18, 2020).

[5] The stock is generally obtained via one or more variable-price convertible debt products required by the lender in connection with making the loan; this may be a debenture or a promissory note.  To be profitable, the lender retains the right to convert "all or any portion" of the principal at any one time – *i.e.* in tranches – and sell the stock thereby acquired in as small or as large of a portion of the debt that the market can bear.  This insulates the lender from price depressions that might result if it had to convert the entire debt all at once and sell a large quantity of stock into the market (in this case, Peak One required a warrant on top of a signing debenture).  The so-called conversion option gives the lender the right to *convert* (or exchange) *at any time* the amount due under the debt product(s) into newly issued shares of stock.

[6] "Agreements" or "Securities Agreements" means the documents executed by Plaintiff in April 2019 (dated April 11, 2019) in favor of PO Fund and PO Investments, consisting of: the Securities Purchase Agreement ("SPA"), **Exhibit 2;** the Debenture ("Debenture"), **Exhibit 3;** and the Common Stock Purchase Warrant ("Warrant"), **Exhibit 4**.  The transaction resulting in the execution of the Agreements is hereinafter referred to as the "April 11 Transaction."

2.      In this case, Peak One received approximately $1,035,016.95 in exchange for a loan of $67,500, which was repaid in 75 days.[7]  On a percentage basis, Peak One's combined return on the Debenture and the Warrant was an unfathomable 1,533% gain.   Under Florida law, a person who knowingly charges an interest rate in excess of 45% APR is designated a "loan shark," and is guilty of criminal usury, a felony in the third degree.  *See* Fla. Stat. § 687.01(1) and (3).  None of this would have been possible without the participation of Darbie, the finder that agreed and conspired with Peak One, and endeavored to make the April 11 Transaction happen.

3.      Accordingly, for these reasons and those set forth below in greater detail, SLN seeks a Verdict and Judgment against the Defendants to void and rescind the Agreements pursuant to sections 29(b) and 15(a) of the Securities Exchange Act of 1934 ("Act"), to compel Peak One to return to SLN all stock and cash payments that Peak One wrongfully acquired under the Agreements, and to compel Darbie to return all sums it received from SLN as a finder, among other relief as set forth below.

## II.     JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 because Plaintiff is asserting a claim under the Securities Exchange Act of 1934.

5.      This Court also has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the action is between citizens of different states and the amount in controversy exceeds $75,000.00.

6.      This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

---

[7] Plaintiff's analysis of the transactions in this case is based on the information currently available to counsel; proof will require expert testimony at trial.

7.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because Peak One's principal place of business is located in this District and because a substantial part of the events giving rise to this action occurred in this District.

8.      Notwithstanding that the Agreements should be voided and rescinded by the Court, the Peak One Defendants should be held estopped from denying that jurisdiction or venue is proper in this Court because PO Fund agreed to it.  *See* SPA ¶ 9.a.  ("Mandatory Forum Selection").[8]

## III.     PARTIES

9.      Plaintiff Social Life is a microcap startup company that licenses a Software-As-A-Service internet platform to various industries. It is a Nevada corporation with its principal place of business at 8100 E. Union Ave., Suite 1809, Denver, CO 80237.

10.     In April 2019, Social Life had three officers and three employees.

11.     Social Life stock trades on the over-the-counter ("OTC") market, where the stocks of early-stage, developing companies (too small for the major exchanges) are traded.

12.     In April 2019 Social Life stock traded on the "OTCQB" market, but the drastic price declines caused by the toxic loans has relegated Social Life stock to the lowest tier of the OTC market, the so-called "pink sheets."

13.     Defendant Peak One Fund is a Delaware limited partnership with its principal place of business at 333 South Hibiscus Drive, Miami Beach, FL 33139. It was formed by Defendant Goldstein in November 2010.

14.     Defendant Peak One Investments is the general partner of Defendant PO Fund, with its principal place of business also at 333 South Hibiscus Drive, Miami Beach, FL 33139. It was

---

[8] SLN is not asserting the SPA as a basis for forum selection or choice of law.

formed by Defendant Goldstein in January 2011.

15.     Defendant Goldstein is the managing member of Defendant PO Investments, and the signatory on the Agreements in this case. Goldstein resides at 333 S. Hibiscus Drive, Miami Beach, Florida, 33139.

16.     Goldstein was registered as a broker with the Financial Industry Regulatory Authority, Inc. ("FINRA") for approximately 16 years beginning in December 1996; his license as a broker terminated in June 2013.

17.     Defendant J.H. Darbie & Co., Inc. is a New York corporation, with its principal place of business located at 40 Wall Street, 30th Floor, New York, NY 10005.  Darbie is a SEC registered broker-dealer that has also been licensed with the State of Florida since July 17, 1998.

## IV.     FACTUAL ALLEGATIONS

### A.   *Peak One is in the Business of Effecting Transactions in Toxic Convertible Debt as an Unlawfully Unregistered Dealer*

18.     In April 2019, SLN hired Darbie as a finder to connect it with potential lenders to fund its operations.

19.     Darbie arranged an introduction between SLN and PO Fund.

20.     The April 11 Transaction arranged by Darbie was unlawful because PO Fund is operating unlawfully as an unregistered securities dealer.

21.     Section 15(a) of the Act at 15 U.S.C. § 78o(a)(1) provides:

It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person  . . . *to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security* (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills)

*unless such broker or dealer is registered* in accordance with subsection (b) of this section.

(Emphasis supplied).

**i.**

22.     Peak One is a dealer in securities under the Act because, *inter alia*, its entire business model is based on the profits reaped from the buying and selling of securities.

23.     A search of the relevant databases confirms that no SEC dealer registration exists for any of the Peak One Defendants, and that none existed in April 2019.[9]

24.     Section 517.12(1) (Registration of dealers, associated persons, intermediaries, and investment advisers) of the Florida Statutes provides that:

> *No dealer, associated person, or issuer of securities shall sell or offer for sale any securities in or from offices in this state, or sell securities to persons in this state from offices outside this state, by mail or otherwise, unless the person has been registered with the office pursuant to the provisions of this section.* The office shall not register any person as an associated person of a dealer unless the dealer with which the applicant seeks registration is lawfully registered with the office pursuant to this chapter.

(Emphasis supplied).

25.     A search of the relevant databases confirms that no Florida Office of Financial Regulation dealer registration exists for any of the Peak One Defendants.[10]

26.     The April 11 Transaction that effected the Agreements in this case was a transaction in securities: As defined in the Act, debentures, warrants and securities purchase agreements are all themselves securities.

27.     The April 11 Transaction was unlawful under 15 U.S.C. § 78o(a)(1) and Florida law because the Peak One Defendants are unregistered dealers, and may not lawfully effect

---

[9] FINRA BrokerCheck database: https://brokercheck.finra.org/search/genericsearch/grid (accessed on June 30, 2021 at 1:40 p.m.).

[10] Florida Office of Financial Regulation REALsystem database, https://real.flofr.com/datamart/selSearchType.do (accessed June 30, 2021 at 2:20 p.m.).

transactions in securities.

28.     The Peak One Defendants made use of the mails, email, and other instrumentalities of interstate commerce to effectuate the April 11 Transaction in securities.

29.     In addition, the Peak One Defendants engaged in numerous other securities transactions related to the Agreements ("Related Transactions"), including the transactions involving exercise of the warrant and sale of millions of warrant shares into the public market.

30.     Each of the Related Transactions is unlawful pursuant to 15 U.S.C. § 78o(a)(1) and Florida law because Peak One is acting as a dealer and none of the Peak One Defendants is registered as a dealer.

### B.  Peak One Reaps Enormous Profits By Buying and Selling Securities for its Own Account

31.     Under the Warrant in this case, Peak One acquired newly issued stock for its own account at a deep discount to the market price.

32.     Peak One did not make its profits from holding the Warrant and waiting for the market price to rise above the exercise price; Peak One made its profits by inserting Warrant provisions that (1) redefine "market price", (2) automatically ratchet down the exercise price, and (3) automatically multiply the number of warrant shares Peak One was entitled to.

33.     Upon information and belief, it is Peak One's practice (as it did in this case) to immediately sell the newly issued warrant stock into the market, to reap the difference between the purchase price and the market price.

34.     Peak One is operating a business in Florida through which it has effected a multitude of transactions with convertible notes or debentures essentially identical to the transaction in this case, and identical to the transactions found to be "dealer" activity in *Almagarby*,

*Keener,* and *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015).

35.     The debt in this case was created in Florida because, *inter alia,* Peak One wired funds from Florida, and Peak One required all payments and stock from SLN to be sent to its account in Florida.

36.     As part of its regular business operations, Peak One buys warrants and convertible securities (debentures or notes) from penny stock issuers in need of cash.

37.     Under the convertible securities, Peak One acquires stock directly from the penny stock issuer at a substantial discount to the market price.

38.     Upon information and belief, Peak One's business operation involves frequent sales of large blocks of newly issued shares into the public markets, which grossly exceeds market demand and causes price declines.

39.     Upon information and belief, Peak One proceeds in the same manner for every convertible note, debenture or warrant it purchases; under its business model, profits are based on how steep a discount it can extract from the issuer, and how quickly the stock can be sold into the market thereafter.

40.     Peak One's buying and selling of securities for its own account involves significantly more than a few isolated transactions.

41.     Peak One's business model is making loans similar to that at issue here, reflected in the Agreements and the Related Transactions; conduct that encompasses at least the past seven years.

42.     SEC filings reveal that Peak One purchased nearly identical convertible securities from at least 37 other penny stock issuers within the last seven years alone.  *See* Exhibit 1.

43.     Peak One drafted the Agreements used in this case; except for the amount loaned,

few, if any of the terms were negotiated.

44.    Upon information and belief, and based on information retrieved from the EDGAR database, Peak One routinely uses the same warrant agreement (a derivative security under the Act) in other transactions as a part of its business operations.

### C.  The April 11 Transaction and the Agreements

45.    Under the Agreements, PO Fund purchased from SLN a convertible Debenture in the amount of $75,000, for which SLN received $67,500 in cash after payment of PO Fund's expenses.  *See* Exhibit 2.

46.    As additional consideration for the loan, PO Fund required SLN to issue a stock purchase Warrant to PO Investments, termed an "inducement fee."  SPA at ¶¶ 1.b., 12.a.  The Warrant gives PO Investments the right to purchase 300,000 shares of SLN stock at a strike price of $0.20 per share, 'subject to adjustment,' for a period of five years.  At the time of issuance, the market price of SLN stock was approximately $0.15.

47.    The Debenture conversion option gives PO Fund the right, at any time, to *convert* (or exchange) the amount due under the Debenture into newly-issued shares of SLN stock. Debenture at § 2.

48.    Conversion of the debt into stock is not on a dollar-for-dollar basis, however. Conversion entitled PO Fund to receive SLN stock at a substantial discount from the prevailing market price:  *35 percent less than the lowest trading price for the stock during the 20 trading days preceding the conversion request.  See* Debenture at § 2.a (p. 2).

49.    The newly issued stock would ordinarily be restricted stock.

50.    Under SEC Rule 144, however, PO Fund obtains freely trading stock if it simply

waits for 180 days before converting.[11] Under this scheme, Peak One can shorten the time it actually holds the stock (holding the stock would incur risk) to essentially zero.  The six-month holding period works in the same manner when applied to warrants, so long as cashless exercise is used.

### D.  The Debenture Provided Peak One with a 267% Return

51.     In May 2019, a dispute arose between PO Fund and SLN over SLN's purported violation of a provision in the Agreement.

52.     The dispute was based on SLN's purported failure to timely notify PO Fund that it was filing an S-1 registration statement for the shares of a different lender.

53.     PO Fund notified SLN that this failure placed SLN in default under the Agreement; although SLN offered to cure the breach by adding PO Fund shares to the S-1, PO Fund rejected SLN's offer to cure.

54.     Pointing to this default, PO Fund cancelled the remainder of the Debenture and demanded accelerated repayment with payment of a substantial default penalty.

55.     On June 25, 2019, a mere 75 days after receipt of the $67,500 loan from PO Fund, SLN repaid the loan.  SLN redeemed the Debenture in full, with added penalties, by paying Peak One $105,000 in settlement of the alleged default.

56.     On an annualized basis, PO Fund's return on the Debenture was **267.66%.**

### E.  The Warrant Provided Peak One with a 766% Return

57.     Section 2(b) of the Warrant is a cryptic, single-spaced paragraph that takes up over

---

[11] Because conversion constitutes an exchange of one security for another, the restriction period begins on the date the debenture or warrant is issued.  *See* 17 C.F.R. § 230.144(d)(3)(ii).

10

half a page, with the heading "Anti-Dilution Adjustments to Exercise Price."

58.     An anti-dilution provision generally acts as a buffer to protect investors against their equity ownership positions becoming diluted or less valuable, which can occur when the percentage of an owner's stake in a company decreases because of an increase in the total number of shares.  Total shares outstanding may increase because of new share issuance based on subsequent rounds of equity financing.[12]

59.     The anti-dilution provision in the Peak One Warrants is different, however. Under Section 2(b), any issuance of shares "to any person or entity" at a price lower than the exercise price, resets the Warrant strike price to match the new low price.

60.     Section 2(b) then requires SLN to issue a multitude of new Warrant shares to the holder (PO Investments), but the number of warrant shares to be issued has nothing to do with dilution.

61.     Instead, under Section 2(b), the number of Warrant shares to be issued to the holder is determined by the relationship of the new, lower strike price to the stated exercise price.

62.     As a result, *Peak One has control of its own strike price*, which it would drive down whenever it effectuates its heavily-discounted conversion under the Debenture.

63.     In sum, this means that the actual Warrant strike price *would never be the $0.20 stated in the Agreements*; the maximum strike price would be the lowest of PO Fund's discounted conversion price.

64.     As a result, in the time between the execution of the Agreements and March 11, 2021, Peak One acquired a total of 78,022,119 shares of SLN stock with an estimated market value

---

[12] *See* www.investopedia.com/terms/a/anti-dilutionprovision.asp (accessed 6/27/2021 at 11:08 p.m.).

of \$930,016.95[13] under the Warrant, and \$105,000.00 under the Debenture, all in return for a \$67,500 loan that SLN repaid in 75 days.

65.     Under a single cashless exercise on March 11, 2021, PO Investments obtained 29,659,091 shares of stock with a market value of \$560,556.82.

66.     In total, Peak One received approximately \$1,035,016.95 in cash and stock in exchange for a loan of \$67,500, which was repaid in 75 days.

67.     On an annualized basis, Peak One's return on the combination of the Debenture and the Warrant was an unfathomable gain of ***766%.***

### F.  The Agreements Create an Unlawful Debt that Makes Peak One Investments and Goldstein "Loan Sharks" Under Florida Law

68.     The Agreements create an unlawful debt under Florida law because the terms violate Florida Statute § 687.071, which prohibits criminal usury and loan sharking.

69.     The elements of a usury claim in Florida require: (1) a loan, express or implied; (2) an understanding between the parties that the money loaned must be repaid; (3) a greater rate of interest than is allowed by law *is paid* or *agreed to be paid* by the borrower; and (4) a corrupt intent to take more than the legal rate for the use of the money loaned.  *Kraft v. Mason*, 668 So. 2d 679, 683 (Fla. Dist. Ct. App. 1996).

70.     A debenture, like the Debenture in this case, is by definition a type of obligation to pay money.

71.     The Agreements make clear that there was an understanding between the parties

---

[13] Calculation based on the SLN stock closing price on the day each exercise occurred.

that the loan of $75,000[14] would need to be repaid by SLN, either in cash or in stock.

72.     As consideration for the loan of $75,000, SLN relinquished, *inter alia,*[15] $930,016.95 in stock, a 1240% gain for Peak One.  On an annualized basis, SLN paid an interest rate on the Debenture of 620%.

73.     Under Florida Statute § 687.01(3), a person who knowingly charges an interest rate in excess of 45% APR is guilty of committing criminal usury, a felony in the third degree.

74.     As defined in Florida Statute § 687.01(1), a person who knowingly charges an interest rate in excess of 45% APR is designated as a "loan shark."

75.     The loan transaction reflected in the Agreements violated Florida Statute § 687.03 because an unlawful and usurious rate of interest was paid or agreed to be paid to Peak One Fund in amounts far greater than the maximum of "the equivalent of 18 percent per annum simple interest."

76.     Peak One Investments and Goldstein acted with a corrupt intent to take more than the legal rate for the use of the money loaned, due to, *inter alia*:  the circumstances surrounding the April 11 Transaction and the Related Transactions; the interest rate of 620% far exceeded the legal maximum of 45%; the fine print of the Warrant and Debenture as discussed above hid the outrageous and unconscionable means used by Peak One Investments and Goldstein to accomplish their unlawful aims; the fact that Peak One Investments and Goldstein drafted the Agreements; and the fact that Peak One Investments and Goldstein are in the business of making unlawful and usurious loans of this type using the same documents; and Peak One Investments and Goldstein appear to derive its revenue solely from transactions of this type.  *See* Exhibit 1.

---

[14] SLN received only $67,500 in cash.

[15] Excluding (for the moment) the $30,000 paid as a default penalty in June 2019 when Peak One cancelled the Agreements.

### G.  Darbie Conspired With Peak One to Create the Unlawful Debt Imposed by the Agreements

77.    While acting as a finder, Darbie was licensed and had a duty to ensure Peak One Fund's eligibility to buy and sell securities from SLN.

78.    Upon information and belief, as part of its due diligence prior to the April 11 Transaction, Darbie conducted an inquiry as to whether the transaction would violate federal or state securities laws or regulations.

79.    As a result, at the time the Agreements were executed, Darbie knew that none of the Peak One Defendants was registered as a dealer with the SEC or the Florida Office of Financial Regulation.

80.    Upon information and belief, Darbie, through its employees, including Mickey McFarlane, operated, conducted, engaged in, and carried on its business as a full-service brokerage firm by coordinating the introduction between SLN and Peak One for securing financing.   *See* Fla. Stat. § 48.193(1)(a).

81.    Darbie agreed, conspired, and endeavored with the Peak One Defendants to go forward with the April 11 Transaction, despite the fact that the Agreements were, and any related transactions thereafter would be, unlawful under both the Exchange Act of 1934 and the Florida Deceptive and Unfair Trade Practices Act.

82.    Darbie was paid by SLN for its services as a finder.

### H.  SLN was Harmed by the Unlawful Loan Made by Peak One Fund and Arranged with the Assistance of Darbie

83.    As a result of Peak One's unlawful loan, and Darbie's agreement and conspiracy with Peak One, and its endeavor to make the loan possible, Peak One obtained millions of stock

purchase warrants to which it was not entitled.

84.     Issuance of the excess warrants was so large that it forced SLN to increase its shares outstanding; the issuance of the new stock upon exercise of the warrants massively diluted SLN stockholders, who ultimately were left with only 1.7% of what they had owned in April 2019.

85.     Once Peak One exercised the warrants, Peak One's immediate and massive selling of the large blocks of newly issued shares into the public market caused enormous depression in the stock price, which even at this time is reduced by 96%.[16]

86.     As a result of Peak One's actions, SLN became unable to privately raise money from other entities, with other toxic lenders becoming the only reasonably available option for short term financing, leading to more losses.  The depressed stock price also caused SLN stock to be delisted from the OTCQB market and relegated to the "pink sheet" stocks, which makes financing even more difficult.

87.     Assessment of the total damage caused by Peak One to SLN is difficult to quantify and would require expert testimony.

88.     In light of difficulty of assessing damages and the equitable remedy of rescission indicated by section 29(b) of the Act, rescission of the Agreements (to return the parties to their pre-contract position) should be effectuated by mandating Peak One to return to SLN every share of stock it acquired under the Warrant, and any cash payments made by SLN in excess of Peak One's $67,5000 loan under the Debenture.

89.     SLN is further entitled to statutory prejudgment interest on the value of the stock and the cash payments.

90.     In the alternative, Peak One should pay rescissionary damages in an amount

---

[16] From $0.15 on April 11, 2019 to $0.0059 on June 30, 2021.

constituting the value of the stock wrongfully acquired and cash amounts paid in penalties, both with statutory prejudgment interest.

91.     SLN is further entitled to the return of any and all payments it made to Darbie to act as a finder in connection with the unlawful loan.

## COUNT I

### Violation of the Exchange Act of 1934, 15 USC § 78cc (b), for Effecting Transactions in Securities as an Unregistered Dealer (*Defendant Peak One Fund*)

92.     Social Life incorporates by reference paragraphs 1-76 and 83-91of this Amended Complaint as if fully set forth herein.

93.     Section 29(b) of the Exchange Act of 1934 ("Act"), codified at title 15 of the United States Code § 78cc (b), provides that every contract made "in violation of any provision of this chapter or of any rule or regulation thereunder . . . shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made . . . any such contract. . . ." 15 U. S. C. § 78cc (b).

94.     The Agreements were made in violation of section 15(a) of the Act (15 U.S.C. § 78o), which prohibits unregistered broker dealers from using any means of interstate commerce to effect transactions in securities.

95.     Peak One Fund is a securities dealer within the meaning of the Act.

96.     Peak One Fund is not registered as such with the SEC or any regulatory body.

97.     Peak One Fund effected transactions in securities in the April 11 Transaction and in the Related Transactions.

98.     Peak One Fund used the means of interstate commerce to effectuate the April 11

16

Transaction and the Related Transactions.

99.    As a party to the Agreements and the Related Transactions, Social Life is in contractual privity with Peak One Fund.

100.    The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, Social Life, a stock issuer, is in the class of persons that the Act was designed to protect.  *See Reg'l Properties, Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 559 (5th Cir. 1982).

101.    Because Peak One Fund effected the April 11 Transaction and the Related Transactions in securities as an unregistered dealer, the Agreements and Related Transactions were unlawful when made and may be voided and rescinded at the option of Social Life.

WHEREFORE, Plaintiff Social Life seeks a Verdict and Judgment against Defendant Peak One Fund on Count I as follows:

a.  Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Social Life requests the Court to declare that

i.   The Agreements and Related Transactions are transactions in securities within the meaning of the Act, 15 U.S.C. 78c(a);

ii.  Peak One Fund is operating as an unregistered dealer in securities, in violation of the Act, 15 U.S.C. § 78o;

iii. The Agreements are void and subject to rescission under the Act, 15 U.S.C. § 78cc; and

iv.  Peak One Fund is entitled to retain the $67,500 that it originally conveyed to SLN, which was repaid 75 days thereafter.

b.  Social Life requests that the Court enter an Order:

i.     Rescinding the Agreements pursuant to the Act, 15 U.S.C. § 78cc;

ii.    Awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Agreements;

iii.   Requiring Peak One Fund to return to SLN all SLN stock obtained via the Warrant;

iv.   Requiring Peak One Fund to return to SLN the amount of $37,500 in cash - - the amount wrongfully paid by SLN under the voided Debenture; and

v.    Awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Warrant.

## COUNT II

**Violation of the Florida Securities and Investor Protection Act, Fla. Stat. § 517.011, *et seq. for* Effecting Transactions in Securities as an Unregistered Dealer (*Defendant Peak One Fund*)**

102.    Social Life incorporates by reference paragraphs 1-76 and 83-91of this Amended Complaint as if fully set forth herein.

103.    Peak One Fund effected transactions in securities in the April 11 Transaction and in the Related Transactions.

104.    Peak One Fund qualifies as a securities dealer under the Florida Securities and Investor Protection Act ("Florida Securities Act"), Fla. Stat. § 517.011, *et seq.,* but is not registered as such with the Florida Office of Financial Regulation.

105.    The April 11 Transaction and the Related Transactions were made in violation of the Florida Securities Act, § 517.12(1), which prohibits unregistered dealers from effecting

18

transactions in securities.

106.    Because PO Fund effected the April 11 Transaction and the Related Transactions in securities as an unregistered dealer, the April 11 Transaction and Related Transactions were unlawful when they were effected.  *See* Fla. Stat. § 517.12(1).

WHEREFORE, Plaintiff Social Life seeks a Verdict and Judgment against Defendant Peak One Fund on Count II as follows:

a.  Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Social Life requests the Court to declare that:

 i.  The Agreements and Related Transactions are transactions in securities within the meaning of the Florida Securities and Investor Protection Act ("Florida Securities Act"), Fla. Stat. § 517.011, *et seq*;

 ii.  Peak One Fund is operating as an unregistered dealer in securities, in violation of the Florida Securities Act, § 517.12(1);

 iii.  The Agreements are subject to rescission at the option of SLN.  *See* Fla. Stat. § 517.12(1); and

 iv.  Peak One Fund is entitled to retain the $67,500 that it originally conveyed to SLN, which was repaid 75 days thereafter.

a.  Social Life requests that the Court enter an Order:

 i.  Rescinding the Agreements pursuant to the Florida Securities Act, § 517.12(1);

 ii.  Awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Agreements;

  iii.  Requiring Peak One Fund to return to SLN all SLN stock obtained via the Warrant;

  iv.  Ordering Peak One Fund to return to SLN the amount of $37,500 in cash - - the amount wrongfully paid by SLN under the voided Debenture; and

  v.  Awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Warrant.

**COUNT III**

**Violation of the Florida Civil Remedies for Criminal Practices Act,
Fla. Stat. § 772.101, *et seq.*, for the Collection of an Unlawful Debt
(*Defendants PO Investments and Goldstein*)**

107. Social Life incorporates by reference paragraphs 1-76 and 83-91of this Amended Complaint as if fully set forth herein.

108. At all times relevant hereto, PO Fund was as an "enterprise" within the meaning of the Florida Civil Remedies for Criminal Practices Act ("Florida Criminal Practices Act"), Fla. Stat. § 772.102(3), as it is a partnership or "other legal entity."

109. At all times relevant hereto, PO Investments and Goldstein violated the Florida Criminal Practices Act, Fla. Stat. § 772.103(1), (2) and/or (3), as follows:

  a. With criminal intent, receiving proceeds derived, directly or indirectly through the collection of an unlawful debt, and using or investing, directly or indirectly, a part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property, or in the establishment or operation of the enterprise, PO Fund, or in the alternative;

  b. Through the collection of an unlawful debt, by acquiring or maintaining, directly

20

or indirectly, an interest in or control of the enterprise, PO Fund, or in the alternative;

c. By being employed by, or associated with, the enterprise, PO Fund, to conduct or participate, directly or indirectly, in PO Fund, through the collection of an unlawful debt.

110.    The unlawful debt collected by PO Investments and Goldstein through the enterprise, PO Fund, included money or other things of value constituting principal or interest of a debt that is legally unenforceable in Florida because it was incurred or contracted in violation of Florida Statute § 687.071, relating to criminal usury and loan sharking. *See* Fla. Stat. § 772.102(2)(a)3.

111.    The unlawful debt was created within the State of Florida.

112.    The loan transaction reflected in the Agreements violates Florida Statute § 687.03 because an unlawful and usurious rate of interest was agreed to be paid and was paid in amounts greater than the legal maximum of "the equivalent of 18 percent per annum simple interest."

113.    The interest charged on the loan provided a return of 620% APR.

114.    Under Florida Statute § 687.01(3), a person knowingly charging an interest rate in excess of 45% APR is guilty of committing criminal usury, a felony in the third degree.

115.    As defined in Florida Statute § 687.01(1), a person knowingly charging an interest rate in excess of 45% APR is designated by statute to be a loan shark.

116.    PO Investments and Goldstein acted  knowingly, with criminal intent, and with a corrupt intent to take more than the legal rate for the use of the money loaned, based on, *inter alia*: the circumstances surrounding the April 11 Transaction and the Related Transactions; the interest rate of 620% far exceeded the legal maximum of 45%; the fine print of the Warrant and Debenture

as discussed above hid the outrageous and unconscionable means by which Peak One was able to accomplish its unlawful aims; the fact that Peak One drafted the Agreements; the fact that Peak One is in the business of making unlawful and usurious loans of this type using the same documents; and the fact that Peak One appears to derive its revenue solely from transactions of this type. *See* Exhibit 1.

117.  The Agreements were made in violation of Florida Criminal Practices Act, Fla. Stat. § 517.12(1).

118.  The unlawful debt was created within the State of Florida.

119.  PO Fund continues to engage in similar unlawful transactions.

120.  As alleged herein, Social Life has been injured and suffered actual damages caused by reason of the violations of the Act by PO Investments and Goldstein.

WHEREFORE, Plaintiff Social Life seeks a Verdict and Judgment against Defendants Peak One Investments and Goldstein on Count III as follows:

  a.  Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Social Life requests the Court to declare that:

    i.  The debt created by the Agreements was incurred or was contracted in violation of Florida Statute § 687.071, relating to criminal usury and loan sharking; and

    ii.  Peak One Investments and Goldstein are in violation of the Florida Criminal Practices Act, Fla. Stat. § 772.101, *et seq.,* through the collection of an unlawful debt.

  b.  Social Life requests that the Court enter an Order awarding Social Life treble damages for threefold the amount of Social Life's actual damages caused to Social

Life by Peak One Investments' and Goldstein's violation of the Florida Criminal

Practices Act, pursuant to Florida Statute § 772.104(1).

## COUNT IV

**Violation of the Florida Civil Remedies for Criminal Practices Act,**
**Fla. Stat. § 772.101, *et seq.*, for Conspiring to Violate the Act**
**(*Defendant Darbie*)**

121.    Social Life incorporates by reference paragraphs 1-91 and 108-20 of this Amended

Complaint as if fully set forth herein.

122.    Darbie violated Florida Civil Remedies for Criminal Practices Act ("Florida

Criminal Practices Act") Fla. Stat. § 772.103 (4) by agreeing and conspiring with PO Investments

and/or Goldstein to, and by endeavoring to, violate, subsection (1), subsection (2), and/or in the

alternative, subsection (3) of that Section of the Florida Criminal Practices Act, in the manner

specifically alleged in Count III herein.

123.    At the time of the execution of the Agreements, Darbie knew that PO Fund was not

registered as a "dealer" with the SEC or the Florida Office of Financial Regulation.

124.    The Agreements were made in violation of the Florida Criminal Practices Act, Fla.

Stat. § 517.12(1).

125.    Darbie agreed and conspired with the Peak One Defendants to, and endeavored to

go forward with, the April 11 Transaction despite the fact that the Agreements were unlawful under

the Florida Criminal Practices Act.

126.    The unlawful debt was created within the State of Florida.

127.    SLN has been injured and suffered actual damages by reason of Darbie's agreement

and conspiracy with PO Investment and/or Goldstein, and by endeavoring to violate the Act in the

manner specifically alleged herein and in Count III.

WHEREFORE, Plaintiff Social Life seeks a Verdict and Judgment against Defendant Darbie on Count IV as follows:

    a.  Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Social Life requests the Court to declare that:

        i.  The debt created by the Agreements was incurred or was contracted in violation of Florida Statute § 687.071, relating to criminal usury and loan sharking; and

        ii.  Darbie is in violation of the Florida Criminal Practices Act, Fla. Stat. § 772.101, *et seq.,* for agreeing and conspiring with PO Investments and Goldstein to, and endeavoring to, violate the Act through the collection of an unlawful debt.

    b.  Social Life requests that the Court enter an Order awarding Social Life treble damages for threefold the amount of Social Life's actual damages caused to Social Life by Darbie's violation of the Florida Criminal Practices Act, pursuant to Florida Statute § 772.104(1).

## COUNT V

### Unjust Enrichment
### *(All Defendants)*

128.    Social Life incorporates by reference paragraphs 1-91 of this Amended Complaint as if fully set forth herein.

129.    By virtue of having engaged in the April 11 Transaction and the Related Transactions, Social Life has conferred property on the Defendants.

130.    By virtue of having engaged in the April 11 Transaction and the Related

Transactions, the Defendants have knowledge of the property conferred on them by Social Life.

131.    The Defendants have voluntarily accepted and retained the property conferred on them by Social Life.

132.    The property conferred on the Defendants through and as a result of the April 11 Transaction and the Related Transactions, including without limitation any and all payments made to Darbie as a finder in connection with the April 11 Transaction, is the fruit of securities transactions that violate federal and Florida law.

133.    The circumstances are such that it would be inequitable for the Defendants to retain any property conferred on them by Social Life without first paying the value thereof to Social Life.

WHEREFORE, Plaintiff Social Life seeks a Verdict and Judgment against all Defendants (Peak One Fund, Peak One Investments, Goldstein, and Darbie) on Count V as follows:

a.  Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Social Life requests the Court to declare that:

i.  The Defendants have voluntarily accepted and retained the property conferred on them by Social Life, through and as a result of the April 11 Transaction and the Related Transactions, which were made in violation of the Securities Exchange Act of 1934, 15 U.S.C. § 78o, as well as any payments made to Darbie as a finder; and

ii.  The circumstances are such that it would be inequitable for the Defendants to retain the property conferred on them by Social Life without first paying the value thereof to Social Life, to prevent the Defendants from being unjustly enriched.

b.  Social Life requests that the Court enter an Order requiring the Defendants to return

to Social Life the value of the property they have unjustly retained.

## COUNT VI

### Constructive Trust
### (*Peak One Defendants*)

134.     Social Life incorporates by reference paragraphs 1-91 of this Amended Complaint as if fully set forth herein.

135.     By virtue of having engaged in the April 11 Transaction and the Related Transactions, Social Life has conferred property on the Defendants.

136.     By virtue of having engaged in the April 11 Transaction and the Related Transactions, the Defendants have knowledge of the property conferred on them by Social Life.

137.     The Defendants have voluntarily accepted and retained the property conferred on them by Social Life.

138.     The property conferred on the Defendants through and as a result of the April 11 Transaction and the Related Transactions, including without limitation any and all payments made to Darbie as a finder in connection with the April 11 Transaction, is the fruit of securities transactions that violate federal and Florida law.

139.     Upon information and belief, the Peak One Defendants have acquired additional property, *i.e.* profits from additional unlawful transactions of the type giving rise to this action, as a result of the property conferred on them through and as a result of the April 11 Transaction and the Related Transactions.

140.     As a result, the Peak One Defendants have been unjustly enriched.

141.     The circumstances are such that it would be inequitable for the Peak One Defendants to retain the property conferred on them by Social Life, or to retain any additional

property acquired by the Peak One Defendants as a result of the property conferred on them by Social Life.

142.    Allowing the Peak One Defendants to retain the property conferred on them by Social Life, or to retain the additional property acquired by the Peak One Defendants as a result of the property conferred on them by Social Life, would inequitably allow the Peak One Defendants to profit from their own wrongdoing, and to dispose of said property for their own purposes including without limitation paying their attorney's fees and costs in connection with this action, and engaging in additional unlawful transactions of the type giving rise to this action.

WHEREFORE, Plaintiff Social Life seeks a Verdict and Judgment against the Peak One Defendants (Peak One Fund, Peak One Investments, and Goldstein) on Count VI as follows:

 a.  Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Social Life requests the Court to declare that the Peak One Defendants have been unjustly enriched as alleged in Count V; and

 b.  Social Life requests that the Court enter an Order imposing a constructive trust on Social Life's property in the possession of the Peak One Defendants and on the additional property acquired by the Peak One Defendants as a result of the property conferred on them by Social Life.

WHEREFORE, as to each of the foregoing Counts 1-VI, to the extent permitted by applicable law and not otherwise requested herein, Social Life requests further that the Court enter an Order:

 a.  Awarding Social Life compensatory, direct, and consequential damages;

 b.  Awarding Social Life punitive and/or treble damages, to deter the Defendants from continuing to engage in the same wrongful and unlawful transactions;

c.  Awarding Social Life its attorney fees and costs associated with this litigation including court costs;

d.  Entering any award of monetary damages jointly and severally against the Defendants; and

e.  Awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues properly so tried.

**DATED: March 7, 2022**                    Respectfully submitted,


                                            */s/ Brenda L. Hamilton*
                                            Brenda L. Hamilton, Esq.
                                            Florida Bar: 0004618
                                            **HAMILTON & ASSOCIATES LAW GROUP**
                                            101 Plaza Real South
                                            Boca Raton, FL 33432
                                            Tel.:        (561) 416-8956
                                            Email:      bhamilton@securitieslawyer101.com

                                            Mark R. Basile, Esq. (*pro hac vice*)
                                            Marjorie M. Santelli, Esq. (*pro hac vice*)
                                            Jacques P. Lerner, Esq. (*pro hac vice*)
                                            Eric J. Benzenberg, Esq. (*pro hac vice*)
                                            Gustave P. Passanante, Esq. (*pro hac vice*)
                                            **THE BASILE LAW FIRM, P.C.**
                                            390 N. Broadway, Ste. 140
                                            Jericho, NY 11753
                                            Tel.:        (516) 455-1500
                                            Email:      mark@thebasilelawfirm.com
                                                        marjorie@thebasilelawfirm.com
                                                        jack@thebasilelawfirm.com
                                                        eric@thebasilelawfirm.com
                                                        gus@thebasilelawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 7th day of March, 2022, I electronically filed a copy of the foregoing document through the Court's CM/ECF System, which will send notifications of the filing to all counsel of record.

**DATED: March 7, 2022**

*/s/ Brenda L. Hamilton*
Brenda L. Hamilton
